**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 15-81062-CIV-MIDDLEBROOKS

DIVERSIFIED MANAGEMENT SOLUTIONS, INC.,

Plaintiff,

vs.

CONTROL SYSTEMS RESEARCH, INC.; CJ ROGERS AVIATION, INC.; ATS METEOROLGY USA, INC.; WX SOLUTIONS, INC.; EKOSYSTEMS, INC.; EAST CRESCENT TECHNOLOGIES, INC., AQUATE CORP.; PHOENIX MANAGEMENTS & CONSULTING GROUP, INC.; TRINITY ANALYSIS AND DEVELOPMENT CORP.; UNITED VANTAGE GROUP, INC.; DAVID ROGERS; JANE ROGERS, RON PLOURDE; DEBORAL PLOURDE, EARL BOYD JR.; MARLON BANKS; JASON TAYLOR; EMILY TAYLOR; MAURICE EVANS; ROBERT PEREZ; JASON FOWLER; and CAMERON MASON,

Defendants.

_______________________________________/

**ORDER ON MOTIONS TO DISMISS**

THIS CAUSE comes before the Court on Defendants' various Motions to Dismiss the Amended Complaint. The Amended Complaint was filed on September 16, 2015, by Diversified Management Solutions. (DE 26, "Compl."). The Amended Complaint alleges four claims against 22 individual and corporate Defendants.

Motions to Dismiss the Amended Complaint were filed by Control Systems Research and Jason Fowler (DE 50), East Crescent Technologies and Earl Boyd Jr. (DE 55), WX Solutions and Deboral Plourde (DE 56), ATS Meteorology and Cameron Mason (DE 63), and CJ Rogers

Aviation, David Rogers, and Jane Rogers (DE 77) (collectively "Defendants").[1] The Motions are now fully briefed.

## I. Background

Plaintiff Diversified Management Solutions ("DMS") is an Iowa corporation involved in providing "Contract Weather Observation" ("CWO") services to the Federal Aviation Administration ("FAA") and the National Weather Service ("NWS"). Defendant Control Systems Research ("CSR"), a Florida corporation, is also involved in providing CWO services to the FAA and NWS. (Compl. at ¶ 2.1).

The FAA awards contracts to providers of CWO services on a five-year cycle. (*Id.* at ¶ 2.2). Every five years, all CWO contracts expire and the FAA solicits bids for renewal contracts for the next five year period. (*Id.* at ¶ 2.2).

In 2012, the FAA solicited bids for the 2012 CWO Renewal ("2012 Renewal"). For the 2012 Renewal, the FAA limited all of the CWO contract opportunities to small and/or small-disadvantaged businesses. (*Id.* at ¶ 2.5). In the 2012 Renewal, the FAA grouped approximately 136 airports in the United States into 18 groups, based on geographical location. (*Id.* at ¶¶ 2.1, 2.5). The FAA awarded one contract for the provision of CWO services per group. An individual contractor could be awarded a maximum of two groups, and, thus, two contracts. (*Id.* at ¶ 2.5).

---

[1] Defendants Trinity Analysis and Maurice Evans also filed a Motion to Dismiss (DE 49); however, on April 13, 2016, Plaintiff dismissed Trinity and Maurice Evans without prejudice (DE 176; 177). Defendant AQuate also filed a Motion to Dismiss (DE 53), but Plaintiff dismissed AQuate with prejudice on May 9, 2016. (DE 181, 183). Additionally, *pro se* Defendants Marlon Banks, Ron Plourde, Emily Taylor, and Jason Taylor filed Answers, which the Court construes as motions to dismiss, but will address in a separate order. (DE 46, 47, 169). Finally, a Clerk's Entry of Default has been entered against Defendants Phoenix Management & Consultant Group, Ekosystems, Inc., Robert Perez and United Vantage Group. (DE 61, 62, 91, 144). Accordingly, "Defendants" in this Order refers only to those Defendants whose Motions to Dismiss are addressed in this Order.

DMS is a "small" business and was eligible to bid on CWO contracts set aside for small businesses in the 2012 Renewal. (*Id.* at ¶ 2.10). CSR was a large business at the time, and was not eligible to bid directly on the contracts. (*Id.* at ¶ 2.7). However, CSR could participate as a subcontractor to a small business bidder. (*Id.* at ¶ 2.11).

DMS alleges that CSR conspired with individuals affiliated with CSR to establish "shell" small-businesses prior to the 2012 Renewal.[2] DMS alleges that CSR manipulated the process in order to receive contracts, which a large business like CSR would not otherwise have been eligible to receive. (*Id.* at ¶ 2.12). According to DMS, CSR had the other Defendants "act as the face of the bid while CSR controlled each from the background." (*Id.* at ¶ 2.22). DMS alleges that these "shell" businesses bid on and obtained contracts from the FAA, in violation of the small-business limitation set forth by the FAA. (*Id.* at ¶ 2.22). DMS further alleges that none of the small businesses disclosed their affiliation with CSR in their bids. (*Id.* at ¶ 2.22). While CSR had experience with providing weather-related services, DMS contends that none of the "shell" businesses had any experience in that field. (*Id.* at ¶ 2.18).

After the bid process was finalized, the FAA did not award DMS any contracts. (*Id.* at ¶ 2.32). Defendants CJ Rogers, ATS, EKO, and WX were awarded seven of the 18 contracts. (*Id.* at ¶ 2.32). DMS alleges these Defendants were all connected to CSR. (*Id.* at ¶ 2.35). Defendants East Crescent, who DMS alleges was also connected to CSR, was not awarded any contracts. (*Id.* at ¶ 2.33).

DMS alleges that it and "other legitimate applicants" formally protested the awards "on the basis that CJ Rogers, ATS, EKO, and WX were all affiliated with CSR, an ineligible large business, and thus were themselves [ineligible] for the awards." (*Id.* at ¶ 2.35).

---

[2] The individuals allegedly affiliated with CSR make up the individual Defendants in this case, and the small businesses they formed are the various corporate Defendants (with the exception of CSR).

According to DMS, the FAA—after conducting an investigation—concluded that CJ Rogers, ATS, EKO, and WX were each affiliated with CSR. (*Id.* at ¶ 2.36) The FAA revoked their contract awards, as the companies were not legitimate small businesses. (*Id.*).

DMS appears to allege that Defendants caused a 15-month delay by their interference with the 2012 Renewal. (*Id.* at ¶ 4.7). DMS alleges that CSR held contracts with the FAA prior to the 2012 Renewal, and because CSR "effectively derailed the entire 2012 FAA CWO renewal bid process," it received "an additional approximately $5,400,000 in revenue [from the extension of its pre-2012 contracts] it would not have earned had the 2012 CWO renewal not been interfered with." (*Id.* at ¶ 4.7, 2.40).

After the FAA revoked Defendants' contract awards, the FAA awarded DMS two contracts. (*Id.* at ¶¶ 2.32, 2.41, 4.8). DMS alleges that but for Defendants' conduct, it would have received two contracts at the time of the original awards. (*Id.* at ¶ 2.41).

On September 16, 2015, DMS filed an Amended Complaint against CSR and individual and corporate Defendants who allegedly participated with CSR in this scheme. DMS alleges four claims: (1) violation of Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"); (2) tortious interference with business relationships; (3) fraud; and (4) civil conspiracy. All Defendants move to dismiss all four counts for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6). Additionally, Defendants WX Solutions and Deboral Plourde move to dismiss for lack of personal jurisdiction, pursuant to Rule 12(b)(2).

## II. Subject Matter Jurisdiction

Defendants contend DMS does not adequately support its assertion that the $75,000 amount-in-controversy has been met, as required by 28 U.S.C § 1332. DMS alleges "damages exceeding seventy-five thousand dollars ($75,000.00), exclusive of interest, attorney's fees, and

costs." (Compl. at ¶ 1.1). Although DMS does not quantify its damages, it claims damages in the form of lost profits resulting from the 15-month delay in receiving two contracts. (*Id.* at ¶ 2.41).

"When a plaintiff invokes federal-court jurisdiction, the plaintiff's amount in controversy allegation is accepted if made in good faith." *Dart Cherokee Basin Operating Co., LLC v. Owens*, 135 S. Ct. 547, 553 (2014); *see also Mt. Healthy City Bd. of Ed. v. Doyle*, 429 U.S. 274 (1977) ("The sum claimed by the plaintiff controls if the claim is apparently made in good faith.") (internal quotations and citations omitted).

Notably, Defendants do not argue that DMS's damages do not exceed $75,000. Rather, Defendants appear to contend that DMS must plead more to support its amount in controversy. However, a plaintiff need only include "a plausible allegation that the amount in controversy exceeds the jurisdictional threshold." *Dart Cherokee Basin Operating Co., LLC*, 135 S. Ct. at 554 (discussing removal).

As the Amended Complaint includes a plausible allegation that the amount in controversy exceeds $75,000, and because Defendants have not argued that the amount in controversy is not satisfied, I accept DMS's allegation as made in good faith.

### III. <u>Choice of law</u>

As a threshold matter, several Defendants[3] contend that Iowa, not Florida, law should apply to DMS's claims. A federal court sitting in diversity applies the conflict of laws rules of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). "Florida utilizes the 'most significant relationship' test to determine which state's law applies to tort claims." *Green Leaf Nursery v. E.I. DuPont De Nemours and Co.*, 341 F.3d 1292, 1301

[3] While not all of the Defendants address the choice of law issue in their Motions to Dismiss, it is a threshold issue the Court will address.

(11th Cir. 2003) (internal citations omitted). The "most significant relationship" test considers: "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, of the parties is centered." *Garcia Health Trust of Dade County*, 841 F.2d 1062, 1064-65 (11th Cir. 1988).

As to the first factor, the only injury DMS alleges is lost profits, which would likely have occurred in Iowa, where DMS is a citizen. Accordingly, this factor favors Iowa.

As to the second factor, DMS contends the harmful conduct would have occurred in Florida—where the alleged conspiracy to violate the FAA bidding process was developed. Defendants contend that the harmful conduct would likely have occurred in Washington, D.C.—where the FAA is headquartered—because D.C. is where bidders submitted their proposals and where the FAA awarded contracts. Because the conduct causing the injury was allegedly centered in Florida, even if the ultimate decisions on bids were made in DC, I find that this factor favors Florida.

As to the third factor, DMS is a citizen of Iowa. Defendant CSR, whom DMS alleges was the driving force behind the conspiracy alleged in the Complaint, is a citizen of Florida. Most of the remaining Defendants are also citizens of Florida; however, a few are citizens of Alabama, Arizona, California, Delaware, and Texas. (Compl. at ¶¶ 1.3-1.26). Because Defendant CSR and most of the smaller Defendants are citizens of Florida, I find this factor favors Florida.

As to the fourth factor, DMS does not allege any relationship between it and Defendants that is sufficient to determine where the Parties relationship, if any, would be centered. This factor does not favor either Iowa or Florida.

Considering these four factors, I find that Florida, not Iowa, has the most significant relationship to DMS's claims, and thus Florida law applies to DMS's claims.

## IV. Motions to Dismiss under Rule 12(b)(6)

### a. Rule 12(b)(6) Standard

A motion to dismiss under Rule 12(b)(6) challenges the legal sufficiency of a complaint. *See* Fed. R. Civ. P. 12(b)(6). In assessing the legal sufficiency of a complaint's allegations, the Court is bound to apply the pleading standard articulated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). That is, the complaint "must . . . contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010) (quoting *Twombly*, 550 U.S. at 570). "Dismissal is therefore permitted when on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action." *Glover v. Liggett Grp., Inc.*, 459 F.3d 1304, 1308 (11th Cir. 2006) (internal quotations omitted) (citing *Marshall Cnty. Bd. of Educ. v. Marshall Cnty. Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir. 1993)).

When reviewing a motion to dismiss, a court must construe plaintiff's complaint in the light most favorable to plaintiff and take the factual allegations stated therein as true. *See Erickson v. Pardus*, 551 U.S. 89, 93 (2007); *Christopher v. Harbury*, 536 U.S. 403, 406 (2002); *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997). However, pleadings that "are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 678; *see also Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1260 (11th Cir. 2009) (stating that an unwarranted deduction of fact is not considered true for purpose of determining whether a claim is legally sufficient).

Generally, a plaintiff is not required to detail all the facts upon which he bases his claim. Fed. R. Civ. P. 8(a)(2). Rather, Rule 8(a)(2) requires a short and plain statement of the claim that fairly notifies the defendant of both the claim and the supporting grounds. *Twombly*, 550 U.S. at 555-56. However, "Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Id.* at 556 n.3. A plaintiff's "obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (citation omitted). "Factual allegations must be enough to raise [plaintiff's] right to relief above the speculative level, on the assumption that all of the allegations in the complaint are true." *Id.*

**b. Florida Deceptive and Unfair Trade Practices Act ("FDUTPA")**

Defendants move to dismiss DMS's claim under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") because DMS does not have standing[4] and because DMS fails to plead actual damages.

FDUTPA is a consumer-protection statute designed to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2); *see also* § 501.202(3) (further defining purpose as "mak[ing] state consumer protection and enforcement consistent with established policies of federal law relating to consumer protection.") (emphasis added).

"A claim for damages under FDUTPA has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *City First Mortg. Corp. v. Barton*, 988 So. 2d

[4] Defendants contend that DMS does not have standing to bring a FDUTPA claim because (1) DMS is not a citizen of Florida and (2) DMS is not a consumer. There is a conflict between Florida courts regarding both of these standing issues. However, I need not decide either issue as—regardless of whether DMS has standing—DMS does not plead facts to support actual damages.

82, 86 (Fla. 4th DCA 2008); *see also Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. 2d DCA 2006), *review denied*, 962 So. 2d 335 (Fla. 2007).

**Actual Damages.** Defendants allege that—assuming DMS has standing—DMS fails to state a claim under FDUTPA because DMS does not plead actual damages.

Florida courts consider actual damages, the third element of a FDUTPA claim, to be a "term of art," defined by "the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered." *Urling v. Helms Exterminators, Inc.*, 468 So. 2d 451, 454 (Fla. 1st DCA 1984); *see also Eclipse Med., Inc. v. Am. Hydro-Surg. Instruments, Inc.*, 262 F. Supp. 2d 1334, 1357 (S.D. Fla. 1999).

"FDUTPA 'actual damages' do not include consequential damages . . . ." *Kia Motors America Corp. v. Butler*, 985 So. 2d 1133, 1140 (Fla. 3d DCA 2008); *see also Rollins, Inc.*, 951 So. 2d at 869 (stating that "for purposes of recovery under FDUTPA, actual damages do not include consequential or special damages"); *City First Mortg. Corp.*, 988 So. 2d at 86 (same). Lost profits are a "quintessential example" of consequential damages. *See Nyquist v. Randall*, 819 F.2d 1014, 1017 (11th Cir. 1987).

DMS argues that the Amended Complaint specifically provides DMS is seeking "actual damages." DMS seeks damages in the form of "*actual damages* including, but not limited to, *lost profit* from the time the FAA initially awarded contracts to the Defendants until the Resolution of the FAA's investigation(s) wherein the contracts were subsequently awarded to DMS." (Compl. at ¶ 4.8) (emphasis added). However, the only facts pled suggest DMS may have suffered damages in the form of lost profits.

Perhaps anticipating that it suffered no damages beyond lost profits, DMS argues that lost profits should be recoverable as "actual damages" under FDUTPA. In support, DMS cites the legislative history of FDUTPA. As originally enacted, FDUTPA provided a cause of action for actual damages to "consumers" who had suffered a loss as a result of a violation of the statute. Fla. Stat. § 501.211(2). However, in 2001, the Florida legislature replaced the term "consumer" in § 501.211(2) with "person." *See Democratic Republic of the Congo v. Air Capital Group, LLC*, 614 F. App'x 460, 468 (11th Cir. 2015). The statute now reads: "[i]n any action brought by a *person* who has suffered a loss as a result of a violation to this [statute], such *person* may recover actual damages[.]" Fla. Stat. § 501.211(2) (emphasis added).

DMS contends that this change means that FDUTPA now provides businesses a private right of action against competitors for engaging in unfair methods of competition. DMS argues that, because businesses can now pursue damages under FDUTPA, the "actual damages" case law from pre-2001 is no longer applicable because the damages suffered by businesses from unfair competition will necessarily be in the form of lost profits.

However, DMS overlooks several post-2001 cases that have found consequential damages, including lost profits, cannot be recovered under FDUTPA. *See Five for Entm't S.A. v. Rodriguez*, 877 F. Supp. 2d 1321, 1331 (S.D. Fla. 2012) ("It remains well-settled in Florida that consequential damages in the form of lost profits are not recoverable under FDUTPA."); *QSGI, Inc. v. IBM Global Financing*, Case No. 11–80880, at *5, 2012 WL 1150402 (S.D. Fla. 2012) (finding plaintiff's damages of "lost profits" and "lost business" did not state actual damages required to plead FDUTPA claim); *see also Rollins v. Butland*, 951 So. 2d at 869.

Despite this authority, DMS argues that a court in this District previously found lost profits recoverable under FDUTPA in the context of actions between competitors in *Tracfone*

*Wireless, Inc. v. Access Telecom, Inc.*, 642 F. Supp. 2d 1354 (S.D. Fla. 2009). *Tracfone Wireless* was a copyright and trademark infringement case in which the court declined to dismiss a FDUTPA claim where plaintiff had alleged that defendant's infringement had been a "threat to and undermined the reputation of [plaintiff's] business" and "led to lost profits . . . ." *Id.* at 1365. However, the *Tracfone* court conducted no analysis of the actual damages issue, and cited no authority for its decision not to dismiss for failure to plead actual damages.[5]

DMS's argument boils down to a policy argument that lost profits *should* be recoverable in the unfair competition context because lost profits are the only type of damages that business competitors will have when a FDUTPA violation occurs. In support, DMS cites Judge Gross's concurring opinion in *Dorestin v. Hollywood Imports, Inc.*, 45 So. 3d 819, 82 (Fla. 4th DCA 2010). There, Judge Gross contends that the majority in *Dorestin* relies on Florida cases which "have improperly limited FDUTPA," and argues for an "interpretation of the statute that carries out the legislature's intent in passing consumer protection legislation." *Id.* at 825. Judge Gross states that the current damages policy does not align with FDUTPA's purpose to "make consumers whole for losses caused by fraudulent consumer practices." *Dorestin*, 45 So. 3d at 828.

However, while Judge Gross makes an interesting argument for the expansion of damages available under FDUTPA, Florida courts have not adopted the view from his concurring opinion. A federal court sitting in diversity looks to the substantive law of the applicable state. *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1983). The substantive law of Florida,

---

[5] DMS also cites two additional cases for the proposition that lost profits are recoverable under FDUTPA in the context of unfair competition claims: *Niles Audio Corp. v. OEM Sys. Co., Inc.*, 174 F. Supp. 2d 1315 (S.D. Fla. 2001) and *Aceto Corp. v. TherapeuticsMD, Inc.*, 953 F. Supp. 2d 1269 (S.D. Fla. 2013). However, the analysis by the courts in both of these cases focuses on whether businesses—as opposed to consumers—can bring a damages claim under FDUTPA. The cases do not go into the *type* of damages, *i.e.*, actual versus consequential.

as it currently stands, leads to the conclusion that lost profits are consequential damages, and, thus, not recoverable under FDUTPA.

Accordingly, DMS's FDUTPA claim against Defendants is dismissed without prejudice for failure to state a claim.

### c. Tortious Interference with Business Relationships

Defendants also contend DMS fails to state a claim for tortious interference with business relationships. Under Florida law, a tortious interference with business relationships claim requires four elements: "(1) the existence of a business relationship [under which the plaintiff has legal rights]; (2) knowledge of the relationship on the part of the defendants; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the tortious interference with the relationship." *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814 (Fla. 1994); *see also G.M. Brod & Co. Inc., v. U.S. Home Corp.*, 759 F.2d 1526, 1534 (11th Cir. 1985) (explaining elements of tortious interference under Florida law). Defendants argue DMS fails to plead the first and third elements of this claim.

**Existence of a business relationship.** Defendants contend DMS fails to plead the first element—existence of a business relationship between DMS and the FAA. In the Complaint, DMS alleges it "maintained a business relationship with the FAA as evidenced by its prior dealings with the FAA and its involvement throughout the 2012 FAA CWO contract renewal process." (Compl. at ¶ 5.1).

"[A]s a general rule, an action for tortious interference with a business relationship requires a business relationship evidenced by an actual and identifiable understanding or agreement which in all probability would have been completed if the defendant had not

intervened." *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 815 (Fla. 1994); *see also ISS Cleaning Services Group, Inc. v. Cosby*, 745 So. 2d 460, 462 (Fla. 4th DCA 1999) (holding the same for a "tortious interference with a *prospective* business relationship") (emphasis added). Although a business relationship need not be evidenced by an enforceable contract, "the alleged business relationship must afford the plaintiff existing or prospective legal or contractual rights." *Ethan Allen, Inc.*, 647 So. 2d at 814 (quoting *Register v. Pierce*, 530 So. 2d 990, 993 (Fla. 1st DCA 1988)). In the absence of a contract, a plaintiff must "advance some evidence" that a contract would have been entered into had a defendant not intervened. *Mobile Shelter Systems USA, Inc. v. Grate Pallet Solutions, LLC*, 845 F. Supp. 2d 1241, 1259 (M.D. Fla. 2012).

DMS pleads that, but for Defendants deceptive practices, the FAA would have awarded DMS two of the eighteen possible contracts. (Compl. at ¶ 4.8). In support, DMS relies on the fact that it ultimately received two FAA contracts after the FAA revoked the contracts with Defendants.

Defendants cite *Duty Free Americas, Inc. v. Estee Lauder Companies, Inc.*, 797 F.3d 1248 (11th Cir. 2015) and *Realauction.com, LLC v. Grant Street Group, Inc.*, 82 So. 3d 1056 (Fla. 4th DCA 2011) to argue that DMS had only a "speculative hope" of securing an FAA contract. Defendants further argue that DMS's actions in bidding on the contract are insufficient to support a claim for tortious interference, stating that a "mere offer to sell" cannot create a contract. *See Duty Free Americas, Inc. v. Estee Lauder Co., Inc.*, 797 F.3d 1248, 1280 (11th Cir. 2015) ("A mere offer to sell . . . does not, by itself, give rise to sufficient legal rights to support a claim of intentional interference with a business relationship.").

However, DMS pleads more than just a "speculative hope" of receiving a contract—DMS pleads that it *did* receive two contracts once the FAA disqualified Defendants. Thus, DMS does not base its claims upon a "speculative hope of future business" or a stand-alone offer to sell. Rather, by virtue of the fact that DMS ultimately received two contracts, DMS pleads an "actual and identifiable relationship" with the FAA that in all probability would have been completed had Defendants not intervened. *See Ethan Allen Inc.*, 647 So. 2d at 815.

Accordingly, DMS alleges facts sufficient to plead that it had an "existing business relationship" with the FAA.

**Intentional and unjustified interference.** Defendants contend that, even if DMS alleges the existence of a "business relationship," DMS fails to allege Defendants intentionally or unjustifiably interfered with that business relationship. DMS responds that "Defendants' overall collective conspiracy derailed the FAA bid process which constitutes the 'intentional and unjustified' interference with DMS's business relationship with the FAA." (DE 89 at 17).

Under Florida law, this third element—intentional and unjustified interference—requires a plaintiff to "allege that the defendants acted without justification." *See Duty Free Americas, Inc.*, 797 F.3d at 1280 (internal quotations omitted). However, Florida recognizes that "where there is no contract right to have the relation continued, but only an expectancy[,] . . . a competitor has the privilege of interference in order to acquire the business for himself." *Id.* Florida courts have found that if the plaintiff's existing contract is terminable at-will, a defendant's interference will be privileged *unless* the plaintiff alleges the defendant's "motive is purely malicious and not coupled with any legitimate competitive economic interest." *Heavener, Ogier Services, Inc. v. R.W. Florida Region, Inc.*, 418 So. 2d 1074, 1077 (Fla. 5th DCA 1982).

Dismissal is appropriate, pursuant to the privilege of interference, if a plaintiff fails to "adequately allege improper methods." *Duty Free Americas, Inc.*, 797 F.3d at 1280-81.

I will address the element of intentional and unjustified interference within three groups of Defendants. The first group includes CSR and those corporate Defendants who submitted, and won, bids in the 2012 Renewal. The second group includes the individual Defendants who DMS alleges worked with or for the corporate Defendants. The final group includes Defendants who submitted, but did not win, bids in the 2012 Renewal.

**1. Defendants CSR, CJ Rogers, ATS Meteorology, and WX Solutions**

Accordingly to the Complaint, Defendants CSR, CJ Rogers, ATS Meteorology ("ATS"), WX Solutions ("WX") were all involved in the submission of successful bids in the 2012 Renewal. (Compl. at ¶¶ 2.43, 2.52, 2.32, 2.53, 2.56.3).

DMS alleges sufficient facts to support that these four Defendants used improper methods in their bidding process so as to overcome Defendants' privilege of interference. DMS alleges, *inter alia*, that Defendants worked together to form new "small" businesses to act as conduits for CSR in the 2012 Renewal. (Compl. at ¶ 2.12). DMS also alleges that—even though each shell business had no independent experience in providing CWO services—the shell businesses failed to list their affiliation with CSR in their bid proposals. (*Id.* at ¶¶ 2.19; 2.22). DMS further alleges that because "CSR was so heavily involved in the preparation of the various conduits' proposals, independent price determinations were not made, i.e., price fixing, in further violation of FAA rules." (Compl. at ¶ 2.25).

Finally, DMS alleges that the FAA revoked these Defendants' contracts following an investigation in which the FAA determined that Defendants obtained their contracts in violation of the 2012 Renewal rules. (Compl. at ¶ 2.37). The Complaint details many of the FAA's

findings regarding the revocation of WX, CJ Rogers and ATS's contracts. (*Id.* at ¶¶ 2.42-2.62). For example, DMS contends that the FAA determined "WX was economically dependent upon CSR for financing," "WX was unduly reliant upon CSR in performing primary and vital contract requirements," and "WX was bringing nothing to the procurement other than its small size." (*Id.* at ¶¶ 2.47.3-2.47.5). As to CJ Rogers and ATS, DMS alleges that the FAA determined that both CJ Rogers and ATS were "unduly reliant upon CSR in meeting past performance requirements," that both proposals submitted by CJ Rogers and ATS "were nearly identical as to font, organization, language, and even typographical errors." (*Id.* at ¶¶ 2.56.1, 2.57.3, 2.58).

Considering these allegations, Plaintiff adequately alleges improper methods by Defendants CSR, CJ Rogers, ATS Meteorology, and WX Solutions. Defendants are not entitled to the privilege of interference. Accordingly, DMS alleges facts to support that Defendants' collective action constituted "intentional and unjustified" interference with DMS's business relationship with the FAA. DMS, therefore, pleads a claim for tortious interference with a business relationship against Defendants CSR, CJ Rogers, ATS Meteorology, and WX Solutions.

**2. Defendants Jason Fowler, David Rogers, Jane Rogers, Cameron Mason, and Deboral Plourde**

Defendants Jason Fowler, David Rogers, Jane Rogers, Cameron Mason, and Deboral Plourde (collectively, "the Individual Defendants") argue in their respective Motions to Dismiss that DMS fails to allege that they intentionally and unjustifiably interfered with DMS's business relationship. The Individual Defendants are each associated with one of the corporate Defendants against whom DMS states a claim. (*See* Section VI. c. i., *supra*). Specifically, Jason Fowler was the president and CEO of CSR. (Compl. at ¶ 2.13). Jane Rogers was the president of CJ Rogers, and her husband David Rogers was a key employee of CSR. (*Id.* at ¶ 2.16).

Cameron Mason was president and CEO of ATS. (*Id.* at ¶ 2.15). Deboral Plourde was the president of WX Solutions. (*Id.* at ¶ 2.16.5).

DMS makes several general allegations that the Individual Defendants were involved in the alleged scheme to manipulate the 2012 Renewal. For instance, the Complaint alleges that "[e]ach of the other named Defendants was directly involved in CSR's scheme and conspired with CSR to improperly manipulate the 2012 FAA CWO renewal bid process." (*Id.* at ¶ 2.13).

However, DMS does not plead any tortious act made by any of the Individual Defendants. Rather, DMS attempts to state a claim against them simply by alleging their connection to the Corporate Defendants. However, "[a] director or officer of a corporation does not incur personal liability for its torts merely by reason of his official character; he is not liable for torts committed by or for the corporation unless he has participated in the wrong." *Home Loan Corp. v. Aza*, 930 So. 2d 814, 815-16 (Fla. 3d DCA 2006) (quoting *Orlovsky v. Solid Surf, Inc.*, 405 So. 2d 1363 (Fla. 4th DCA 1981)). In some instances, an officer or director of a corporation can be held liable if "he participates in the commission of a tort, whether or not it is also by or for the corporation." *Id.*; *see also White-Wilson Medical Center v. Dayta Consultants, Inc.*, 486 So. 2d 659, 661 ("Individual officers and agents of a corporation are personally liable where they have committed a tort even if such acts are performed within the scope of their employment or as corporate officers or agents.").

The only allegation made by DMS as to Jason Fowler is that "[a]t all times material, Jason Fowler was the president of CSR and was directly involved in CSR's scheme." (Compl. at ¶ 2.14). DMS does not allege *any* acts that Jason Fowler allegedly took in furtherance of CSR's scheme. Simply alleging that Jason Fowler was the president of CSR is not enough to plead that

Jason Fowler participated in the tortious conduct of the corporation. *See Home Loan Corp.*, 930 So. 2d at 815-16.

DMS's allegations as to Cameron Mason are similarly deficient. DMS alleges that "Cameron Mason was the President and CEO of ATS and was directly involved in CSR's scheme." (*Id.* at 2.15; *see also id.* at 2.57.1). As with Jason Fowler, however, DMS fails to plead any acts connecting Mason to CSR's scheme.

The only facts that DMS alleges as to Jane Rogers is that "Jane Rogers is listed as the president of CJ Rogers. David Rogers and Jane Rogers are husband and wife. David Rogers is/was a key employee of CSR." (Compl. at 2.16.1). As with Jason Fowler and Cameron Mason, simply alleging that Jane Rogers was the president of CJ Rogers is not enough to state a claim for tortious interference.

The only additional allegation DMS makes as to David Rogers is that he was a "former key employee of CSR" and was "a director of CJ Rogers and was significantly involved in its organization." (*Id.* at 2.56.3). However, DMS does not plead any facts to suggest that David Roger's involvement in CJ Rogers was tortious, or that David Rogers, by virtue of being a director of CJ Rogers, intentionally and unjustifiably interfered with DMS's business relationship.

Finally, as to Deboral Plourde, DMS only states that Plourde "has committed tortious acts within Florida including, at a minimum, conspiring with CSR in Florida to commit deceptive and unfair practices, tortious inference with business relationships and fraud and communicating with CSR in Florida in furtherance of the conspiracy." (Compl. at 1.17). However, this mere recitation of the causes of action DMS brings against Deboral Plourde is not sufficient to state a claim against Plourde. *See Twombly*, 550 U.S. at 555 ("[A] plaintiff's obligation to provide the

grounds to his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.") (internal quotations omitted)). DMS also alleges that "Deboral Plourde is listed as president of WX. Ron Plourde and Deboral Plourde are husband and wife. Ron Plourde is/was a key employee of CSR." (*Id.* at 2.16.5). As with Jane Rogers, pleading that Deboral Plourde was the president of WX, without more, is not enough to plead that Plourde participated in WX's tortious conduct.

Accordingly, DMS fails to allege facts to support that the Individual Defendants' actions constituted "intentional and unjustified" interference with DMS's business relationship with the FAA. Thus, DMS's tortious interference with business relationships claim is dismissed as to Defendants Jason Fowler, Cameron Mason, Jane Rogers, David Rogers, or Deboral Plourde.

**3. Defendants East Crescent and Earl Boyd**

Defendants East Crescent and Earl Boyd, president of East Crescent, argue that DMS fails to plead a tortious interference claim against them. (DE 55). East Crescent and Earl Boyd allege that they never received any contracts in the FAA Renewal (Compl. at ¶ 2.63), and, thus, DMS cannot show that they intentionally and unjustifiably interfered with DMS's relationship with the FAA.

Despite not being awarded any contracts from the FAA, DMS contends that East Crescent and Earl Boyd participated in the conspiracy with the other Defendants to undermine the bid process. (*Id.* at ¶ 2.33). However, DMS does not specify how they participated in this conspiracy with the other Defendants. While the FAA ultimately concluded that several Defendants were affiliated with CSR and, thus, ineligible for awards, the FAA made no similar findings as to East Crescent. (*Id.* at ¶ 2.36).

DMS alleges that East Crescent was originally a protégé of CSR. (*Id.* at ¶ 2.20). As a protégé, East Crescent intended to bid on contracts in the 2012 Renewal. (*Id.*). Through the protégé process, CSR would act as a "mentor" to East Crescent, among other small businesses, once the small businesses received contracts. (*Id.*). Prior to East Crescent submitting any bid in the 2012 Renewal, the FAA changed the rules of the protégé program, limiting the protégés of any one mentor to a total of two CWO contracts. (*Id.* at ¶ 2.21). Following the rule change, East Crescent removed itself as a protégé of CSR prior to bidding on contracts in the 2012 Renewal. (*Id.*). Accordingly, DMS's only allegation that connects East Crescent to CSR ended prior to East Crescent bidding on any of the CWO contracts.

DMS then alleges that East Crescent's proposed subcontractor was CSR, but East Crescent did not list its "affiliation" with CSR. (*Id.* at ¶ 2.64). However, DMS does not allege how East Crescent was affiliated with CSR, beyond using CSR as a subcontractor. Rather, DMS generally alleges that East Crescent "engaged in the overall conspiracy and the same improper conduct [as the other Defendants] thus tainting the bidding process." (*Id.* at ¶ 2.33). This is not enough to plead that East Crescent acted "without justification" and, thus, intentionally and unjustifiably interfered with DMS and the FAA's business relationship.

DMS also fails to allege any facts regarding Earl Boyd's role in East Crescent's alleged tortious interference. DMS only alleges that Earl Boyd is the president of East Crescent. As discussed above, simply alleging that an individual is the president of a corporation does not mean that the person incurs personal liability for the actions of the corporation if the president did not participate in the wrong. *See Home Loan Corp.*, 930 So. 2d at 815-16.

Accordingly, DMS's tortious interference with business relationships claim is dismissed as to Defendants East Crescent and Earl Boyd.

**d. <u>Fraud</u>**

In Florida, a fraud claim requires a plaintiff to allege "that (1) the defendant made a false statement about a material fact; (2) the defendant knew the statement was false when he made it . . .; (3) the defendant intended that the plaintiff rely and act on the false statement; and (4) the plaintiff justifiably relied on the false statement to his detriment." *Simon v. Celebration Co.*, 883 So. 2d 826, 832 (Fla. 5th DCA 2004); *see also Taylor Woodrow Homes Florida, Inc. v. 4/46-A Corp.*, 850 So. 2d 536 (Fla. 5th DCA 2003). "A plaintiff's 'failure to allege a specific element of fraud in a complaint is fatal when challenged by a motion to dismiss.'" *Infante v. Bank of America Corp.*, 468 F. App'x 918, 920 (11th Cir. 2012) (quoting *Strack v. Fred Rawn Constr., Inc.*, 908 So. 2d 563, 565 (Fla. 4th DCA 2005)).

Defendants contend that DMS fails to plead the third and fourth elements—that Defendants intended that DMS rely and act on the false statements, and that DMS justifiably relied on the false statements. DMS responds that it alleges "[e]ach of the Defendants intended that the FAA rely on these fraudulent misrepresentations . . ." and that "[e]ach of the Defendants intended that the other prospective bidders, including DMS, rely on these false statements in preparing and submitting their own bids . . . ." (Compl. at ¶¶ 6.2, 6.3).

**Intended to Rely.** DMS argues that although Defendants' misrepresentations were made to the FAA, it has still satisfied the third element—that Defendants intended DMS to rely on their false statements.

DMS cites *Koch v. Royal Wine Merchants, Ltd.*, 907 F. Supp. 2d 1332 (S.D. Fla. 2012), for the proposition that a maker of a fraudulent misrepresentation can be liable if "the misrepresentation, although not made directly to the other, is made to a third person and the maker intends or has reason to expect that its terms will be repeated or its substance

communicated to the other, and that it will influence his conduct in the transaction involved." *Id.* at 1344 (quoting Rest. (Second) of Torts § 533 (1977)). DMS argues that because the statement was made to the FAA with the intention that others would rely on it, DMS sufficiently pleads that Defendants intended other bidders, like DMS, to rely on the statement.

However, DMS's case is readily distinguishable from *Koch*. There, the plaintiff, a purchaser of wine, sued a seller of wine for fraudulent misrepresentation. The plaintiff alleged that the seller affixed counterfeit labels to wine bottles it sold. *Koch*, 907 F. Supp. at 1336. In *Koch*, it was presumed that other parties would rely on the labels affixed to the wine by the defendant, as wine is a consumer product that would presumably be sold and resold. But where *Koch* dealt with a misrepresentation on a consumer product, the instant case addresses bids for government contracts, which, presumably, only the FAA would receive, and which would not be disclosed to the other bidders.

DMS does not plead facts to suggest that Defendants intended their bids to be relied on by anyone other than the FAA. DMS further does not plead that Defendants knew their bids would be made public, or that other bidders would have access to Defendants' bids when preparing their own bids. Accordingly, DMS fails to plead facts to support that Defendants intended DMS to rely on Defendants' fraudulent statements.

**Justifiable Reliance.** DMS also fails to plead facts to support the fourth element—that DMS justifiably relied on Defendants' misrepresentations. DMS fails to allege any facts supporting that it took any actions in reliance on Defendants' alleged fraudulent statements. DMS does not allege whether it saw Defendants' bids prior to submitting its own bid, or whether it *ever* saw Defendants' bids. Logically, DMS could not have relied on a misrepresentation which it does not allege it was even aware of at the time it submitted its bid. *See Infante v. Bank*

*of Am. Corp.*, 680 F. Supp. 2d 1298, 1305 (S.D. Fla. 2009) ("[L]ogic dictates that where one is not aware of a misrepresentation, he cannot possibly rely on it.").

As DMS fails to plead the third and fourth elements, DMS fails to sufficiently state a claim for fraud. Thus, DMS's fraud claim against Defendants is dismissed without prejudice.

**e. Civil Conspiracy**

Under Florida law, civil conspiracy requires: "(a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy." *Raimi v. Furlong*, 702 So. 2d 1273, 1284 (Fla. 3d DCA 1997); *see also Florida Fern Growers Ass'n, Inc. v. Concerned Citizens of Putnam County*, 616 So. 2d 562, 565 (Fla. 5th DCA 1993). Further, a cause of action for civil conspiracy will only exist if the plaintiff pleads an "actionable underlying tort or wrong." *Florida Fern Growers Ass'n Inc.*, 616 So. 2d at 565; *see also United Technologies Corp. v. Mazer*, 556 F.3d 1260, 1281 (11th Cir. 2009) ("Under Florida law, a civil conspiracy must have as its object the commission of an underlying tort."). If there is no underlying civil wrong, there is no conspiracy. *Estate of Scutieri v. Chambers*, 386 F. App'x 951, at *2 (11th Cir. 2010); *see also Liappas v. Augoustis*, 47 So. 2d 582, 582 (Fla. 1950) ("The gist of a civil action for conspiracy is not the conspiracy itself, but the civil wrong which is done pursuant to the conspiracy . . . .").

Here, DMS alleges that Defendants engaged in a civil conspiracy to manipulate the 2012 Renewal. (Compl. at ¶ 3.1-3.3). Defendants contend that DMS does not plead any actionable underlying tort or wrong, and, thus, fails to plead an actionable civil conspiracy. As discussed above, DMS pleads a claim for tortious interference with business relationships against Defendants CSR, CJ Rogers, WX, and ATS. Accordingly, because DMS pleads an actionably

underlying tort or wrong against these four Defendants, it is necessary to consider whether the other elements of civil conspiracy have been met.

DMS pleads facts to support the first element—that there was an agreement between two or more parties. An agreement can be shown by circumstantial evidence. *Koch*, 907 F. Supp. at 1346. Here, DMS alleges a number of facts to support that an agreement to manipulate the bid process existed between Defendants CSR, CJ Rogers, WX, and ATS. DMS alleges that the FAA investigation revealed that CJ Rogers and ATS were both "unusually reliant" on CSR in a number of ways, including that CJ Rogers and ATS both intended to use CSR to administer the contract. (Compl. at ¶¶ 2.56.3, 2.57.3). Additionally, DMS pleads that the FAA analyzed the proposals of both CJ Rogers and ATS and noted "they were nearly identical as to font, organization, language and even typographical errors." (*Id.* at ¶ 2.58). DMS further pleads that the FAA ultimately concluded that "CSR, and not CJ Rogers or ATS, actually prepared substantial portions of the respective proposals serving as additional grounds for disqualification." (*Id.* at ¶ 2.61). DMS pleads that similar findings were made as to WX. (*Id.* at ¶¶ 2.47.1, 2.47, 2.47.4, 2.47.5).

DMS also pleads facts to support the second element—the doing of an unlawful act—as DMS states a claim for tortious interference with business relationships against Defendants CSR, CJ Rogers, WX, and ATS.

DMS also pleads facts to support the third element—that the Defendants performed some overt act in furtherance of the conspiracy. DMS pleads that CJ Rogers and ATS utilized CSR's financial and experiential position to fulfill contract requirements, allowed CSR to prepare their proposal, shared price information, and withheld information that CSR, a large business entity, was actively involved with CJ Rogers and ATS's bids, in violation of the FAA guidelines.

(Comp. at ¶ 2.58, 2.56.3, 2.57.3, 3.2). DMS pleads that WX depended on CSR for financing and for performance of the contracts. (*Id.* at ¶¶ 2.47.3, 2.47.4). Taken together with the allegations in support of the tortious interference claim, DMS pleads enough to support its claim that Defendants CSR, CJ Rogers, WX, and ATS performed an "overt act" in furtherance of a conspiracy to tortuously interfere with the bid process.

Finally, DMS pleads facts to support the final element—that it suffered damages as a result of Defendants' conduct. DMS alleges that, as a result of the alleged conspiracy, it suffered lost profits during the fifteen months before the FAA revoked the contracts that it improperly awarded to Defendants. (Compl. at ¶ 2.41, 3.2).

Accordingly, DMS pleads a claim of civil conspiracy against Defendants CSR, CJ Rogers, WX, and ATS.

However, as discussed above (*see* Section IV, b, c, d), DMS fails to state a claim for any underlying tort or wrong—FDUTPA, tortious interference with a business relationship, or fraud—as to Defendants East Crescent, Earl Boyd, Jason Fowler, David Rogers, Jane Rogers, Cameron Mason, and Deboral Plourde. Because DMS fails to plead any underlying tort or statutory wrong as to these Defendants, DMS does not allege a claim of civil conspiracy against them. *See Estate of Scutieri*, 386 F. App'x at *2. Accordingly, DMS's civil conspiracy claim against Defendants East Crescent, Earl Boyd, Jason Fowler, David Rogers, Jane Rogers, Cameron Mason, and Deboral Plourde is dismissed without prejudice.

## V. **Motion to Dismiss under Rule 12(b)(2)**

Defendants Deboral Plourde and WX Solutions ("WX") also move to dismiss for lack of personal jurisdiction, pursuant to Rule 12(b)(2). Deboral Plourde is a citizen of Arizona. (*Id.* at ¶ 1.17). However, because, as discussed above, DMS does not state a claim as to Deboral

Plourde, the Court need not reach whether the exercise of personal jurisdiction over Deboral Plourde is proper. WX is a California corporation, which is now dissolved. Prior to its dissolution, its principal place of business was San Diego County, California. (Compl. at ¶ 1.8).

a. **Rule 12(b)(2) Standard**

Where, as here, a district court does not hold an evidentiary hearing on a motion to dismiss for lack of personal jurisdiction, "the plaintiff must establish a prima facie case of personal jurisdiction." *Melgarejo v. Pycsa Panama, S.A.*, 537 F. App'x 852, 863 (11th Cir. 2013) (citing *Mut. Serv. Ins. Co. v. Frit Indus., Inc.*, 358 F.3d 1312, 1319 (11th Cir. 2004)). "A prima facie case is established if the plaintiff presents sufficient evidence to defeat a motion for a directed verdict. The district court must construe the allegations in the complaint as true, to the extent they are uncontroverted by defendant's affidavits or deposition testimony." *Morris v. SSE, Inc.*, 843 F.2d 489 (11th Cir. 1988); *see also Madara v. Hall*, 916 F.2d 1510, 1514 (11th Cir. 1990). "Where . . . the defendant submits affidavits to the contrary, the burden traditionally shifts back to the plaintiff to produce evidence supporting jurisdiction unless those affidavits contain only conclusory assertions that the defendant is not subject to jurisdiction." *Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1269 (11th Cir. 2002). "Where the plaintiff's complaint and supporting evidence conflict with the defendant's affidavits, the court must construe all reasonable inferences in favor of the plaintiff." *Id.*

Personal jurisdiction may be exercised over a nonresident defendant if: (1) a basis of jurisdiction is provided under the forum state's long arm statute; and (2) the exercise of jurisdiction under state law comports with the Due Process Clause of the Fourteenth Amendment. *Mut. Serv. Ins. Co. v. Frit Indus., Inc.*, 358 F.3d 1312, 1319 (11th Cir. 2004) (citing *Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623, 626 (11th Cir. 1996)). The reach of a

forum state's long-arm statute is a question of state law. *Abramson v. Walt Disney Co.*, 132 F. App'x 273, 275 (11th Cir. 2005). Once the plaintiff demonstrates that the defendant meets at least one of the jurisdictional criteria of the state's long-arm statute, the court must then determine whether the nonresident defendant possesses sufficient minimum contacts with the state to satisfy the Due Process Clause of the Fourteenth Amendment. *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945); *see also Abramson*, 132 F. App'x at 275.

**b. <u>Discussion</u>**

**Florida's Long Arm Statute.** DMS argues that the Court has jurisdiction over WX pursuant to § 48.193(1) of Florida's long arm statute, which provides that a nonresident defendant is subject to personal jurisdiction in Florida for "committing a tortious act within this state." *See* Fla. Stat. § 48.193. The requirement that a defendant commit a tortious act within Florida can be satisfied through "the nonresident defendant's telephonic, electronic, or written communications into Florida," if the cause of action arises from those communications. *Wendt v. Horowitz*, 822 So. 2d 1252, 1260 (Fla. 2002). Additionally, when a plaintiff alleges a civil conspiracy, "Florida courts have held that the state's long-arm statute can support personal jurisdiction over any alleged conspirator where any other co-conspirator commits an act in Florida in furtherance of the conspiracy, even if the defendant over whom personal jurisdiction is sought individually committed no act in, or had no relevant contact with, Florida." *United Technologies Corp. v. Mazer*, 556 F.3d 1260, 1281-82 (11th Cir. 2009); *see also Posner v. Essex Ins. Co., Ltd.*, 178 F.3d 1209, 1217 (11th Cir. 1999). "Conspiracy-imputed personal jurisdiction" requires that the formation of the conspiracy or the underlying tort upon which the civil conspiracy is predicated occur in Florida. *See United Technologies*, 556 F.3d at 1283; *see also*

*Arch Aluminum & Glass Co. Inc. v. Haney*, 964 So. 2d 228, 234-35 (Fla. 4th DCA 2007) (finding no personal jurisdiction where neither the conspiracy nor underlying tort occurred in Florida).

Here, as discussed above, DMS states a claim that WX participated in a civil conspiracy with CSR and the other Defendants to undermine the bid process and receive contracts from the FAA. (Compl. at ¶¶ 2.16.5, 2.42-2.49). DMS pleads that the FAA revoked the award of two contracts to WX following an investigation, wherein the FAA determined that WX's affiliation with CSR violated the 2012 Renewal's small business standard size requirement. (*Id.* at 2.36). DMS pleads that WX was incorporated in 2011, "just a year before the bid process, and was dependent upon CSR for key personnel and management." (*Id.* at 2.47.1). DMS further pleads that the FAA, after investigating WX Solutions determined that "WX was economically dependent upon CSR for financing" (*id.* at ¶ 2.47), "WX was overall unduly reliant upon CSR in performing primary vital contract requirements" (*id.* at 2.47.4), and "WX was bringing nothing to the procurement other than its small size" (*id.* at 2.47.5).[6]

Even if these contacts between WX and CSR do not rise to the level of a "tortious act" committed within Florida, *see Wendt*, 822 So. 2d at 1260, DMS pleads sufficient facts to show a conspiracy between WX and CSR existed. DMS further pleads sufficient facts to show that CSR committed acts in Florida in furtherance of the conspiracy. DMS pleads that CSR is incorporated in Florida and has its principal place of business in Florida. (Compl. at ¶¶ 1.4, 1.20). DMS alleges that CSR directed WX's activities and FAA filings, engaged in overt acts in furtherance of the conspiracy in Florida, and communicated with Defendants—including WX—in Florida. (*Id.* at ¶ 1.26). Accordingly, because CSR, as a co-conspirator of WX, performed

[6] In support of these allegations, DMS attaches to its response to WX's Motion to Dismiss a memorandum from the FAA title "Size Determination of WX Solutions, Inc." (DE 94-1).

acts in furtherance of the conspiracy in Florida, personal jurisdiction over WX as a co-conspirator is permitted under Florida's long arm statute. *See Wilcox v. Stout*, 637 So. 2d 335 (Fla. 2d DCA 1994) ("If [plaintiff] has successfully alleged a cause of action for conspiracy among [defendants] to commit tortious acts towards [plaintiff], and if she has successfully alleged that any member of that conspiracy committed tortious acts in Florida in furtherance of that conspiracy, then all of the conspirators are subject to the jurisdiction of the state of Florida through its long-arm statute, section 48.193].").

WX offers an affidavit by Deboral Plourde to rebut DMS's allegations of personal jurisdiction. (DE 56 at 23-26). Deboral Plourde alleges, *inter alia*, that WX did not have employees or customers in Florida, did not execute documents for the FAA bid in Florida, and did not knowingly transact business in Florida. (DE 56 at 23, 24). But the affidavit is most notable for what it does not allege—namely, Plourde does not state that WX did not communicate with CSR in Florida, or that WX was not connected to CSR. Thus, Plourde's affidavit fails to undermine Plaintiff's basis for personal jurisdiction.

Accordingly, the Court has personal jurisdiction over WX based on the civil conspiracy alleged in the Complaint

**Due Process Clause/Minimum Contacts.** Because the Florida long arm statute provides jurisdiction over WX, the next inquiry is whether the Court's exercise of jurisdiction over WX satisfies Due Process. "In specific personal jurisdiction cases, [the Eleventh Circuit] appl[ies] the three-part due process test, which examines (1) whether the plaintiff's claims arise out of or relate to at least one of the defendant's contacts with the forum; (2) whether the nonresident defendant purposefully availed himself of the privilege of conducting activities within the forum state, thus invoking the benefit of the forum state's laws; and (3) whether the exercise of

personal jurisdiction comports with traditional notions of fair play and substantial justice." *Louis Vuitton Malletier, S.A.*, 736 F.3d at 1355 (internal quotations and citations omitted); *see also S.E.C. v. Carrillo*, 115 F.3d 1540, 1542 (11th Cir. 1997) (outlining criteria necessary to satisfy minimum contacts for the purposes of specific jurisdiction).

*Relatedness Prong.* WX's contacts must "be related to [DMS's] cause of action *or* have given rise to it." *See SEC*, 115 F.3d at 1542. As discussed above, DMS states a cause of action for civil conspiracy, the crux of which is CSR's use of a number of "shell" small-businesses, including WX, to bid on contracts in the 2012 Renewal. As discussed above, DMS alleges a number of factors that connect WX to this conspiracy with CSR, a Florida corporation conducting business in Florida. Accordingly, because the contacts WX had with CSR would—by their nature—relate to the conspiracy, WX's contacts with Florida satisfy the relatedness prong.

*Purposeful Availment.* Under the second prong of the minimum contacts test, DMS must show that WX "purposefully availed itself of the privilege of conducting its activities in the forum." While DMS does not specifically allege that WX conducted activities in Florida, it alleges that the conspiracy WX engaged in was based in Florida. WX has thus purposefully availed itself of the privilege of conducting activities in Florida by choosing to enter into a conspiracy with CSR and the other Defendants, wherein the bulk of the conspiracy took place in Florida. *See generally Smolinksi and Associates, Inc. v. Continental Airlines, Inc.*, 2000 WL 1100106, at *2 (S.D. Fla. 2000) (finding minimum contacts satisfied where Florida court had long arm jurisdiction based on a civil conspiracy and where defendant had not rebutted the allegations of civil conspiracy).

*Fair Play and Substantial Justice.* The third and final prong requires the Court to consider whether WX's conduct with Florida is such that WX "should reasonably anticipate being haled into court [here]." *Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623, 631 (11th Cir. 1996). Because CSR is a Florida resident, WX's alleged participation in the conspiracy with CSR—particularly the allegations that WX depended on CSR economically and for staff—supports that WX could reasonably anticipate being haled into Court in Florida. *See generally NHB Advisors v. Czyzyk*, 95 So. 3d 444, 449 (Fla. 4th DCA 2012) (finding defendant should reasonably anticipate being haled into court in Florida when plaintiff sufficiently alleged that defendant took part in a conspiracy where other principals committed tortious acts in Florida, even though defendant never personally committed any tortious acts within the state of Florida).

Accordingly, the Court's exercise of personal jurisdiction over WX does not violate the Constitution's Due Process Clause. WX's Motion to Dismiss on the basis of personal jurisdiction is denied.

## VI. <u>Conclusion</u>

Based on this Order, Plaintiff shall file any amended complaint by **May 23, 2016.** Additionally, the Parties shall file a Joint Proposed Scheduling Order and Status Report ("Joint Report") by **May 27, 2016.** The Joint Report should include a revised discovery plan and proposed trial date. The Parties shall also address whether they still seek the relief sought in each of the remaining pending motions. If the Parties no longer seek the relief sought in any pending motion, the motion should be withdrawn by May 27, 2016.

Accordingly it is hereby

**ORDERED AND ADJUDGED** that

**(1)** Motion to Dismiss the Amended Complaint by East Crescent Technologies and Earl Boyd Jr. (DE 55) is **GRANTED.**

**(2)** Motions to Dismiss the Amended Complaint by Defendants Control Systems Research and Jason Fowler (DE 50), ATS Meteorology and Cameron Mason (DE 63), WX Solutions and Deboral Plourde (DE 56), and CJ Rogers Aviation, David Rogers, and Jane Rogers (DE 77) are **GRANTED IN PART AND DENIED IN PART.**

**(3)** DMS's FDUTPA claim against Defendants Control Systems Research, Jason Fowler, East Crescent Technologies, Earl Boyd Jr., ATS Meteorology, Cameron Mason, WX Solutions, Deboral Plourde, CJ Rogers Aviation, David Rogers, and Jane Rogers is **DISMISSED WITHOUT PREJUDICE.**

**(4)** DMS's claim for tortious interference with business relationships against Defendants Control Systems Research, ATS Meteorology, WX Solutions, and CJ Rogers Aviation **REMAINS PENDING**.

**(5)** DMS's claim for tortious interference with business relationships against Defendants East Crescent, Earl Boyd, Jason Fowler, David Rogers, Jane Rogers, Cameron Mason, and Deboral Plourde is **DISMISSED WITHOUT PREJUDICE.**

**(6)** DMS's fraud claim against Defendants Control Systems Research, Jason Fowler, East Crescent Technologies, Earl Boyd Jr., ATS Meteorology, Cameron Mason, WX Solutions, Deboral Plourde, CJ Rogers Aviation, David Rogers, and Jane Rogers **DISMISSED WITHOUT PREJUDICE.**

(7) DMS's civil conspiracy claim against Defendants Control Systems Research, ATS Meteorology, WX Solutions, and CJ Rogers Aviation **REMAINS PENDING.**

(8) DMS's civil conspiracy claim against Defendants East Crescent, Earl Boyd, Jason Fowler, David Rogers, Jane Rogers, Cameron Mason, and Deboral Plourde is **DISMISSED WITHOUT PREJUDICE.**

(9) Any amended complaint must be filed by **May 23, 2016.**

(10) The Parties shall file a Joint Proposed Scheduling Order and Status Report by **May 27, 2016.**

**DONE AND ORDERED** in Chambers at West Palm Beach, Florida, this 13 day of May, 2016.

DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

Copies to: Counsel of Record